UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KENSHOND K. LOVE, JR.,

                                Plaintiff,

        v.                                          Case No. 22-cv-780-pp

DAKOTA MONKA,

                                Defendant.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 15), GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31) AND DISMISSING CASE**

        Plaintiff Kenshond K. Love, Jr., who is representing himself, is proceeding under 42 U.S.C. §1983 on a claim against a correctional officer at Kettle Moraine Correctional Institution. Both parties have moved for summary judgment. Dkt. Nos. 15, 31. The court will deny the plaintiff's motion, grant the defendant's motion and dismiss the case.

I.      **Facts**

        A.      Procedural Background

        On July 7, 2022, the court received the plaintiff's complaint asserting claims against numerous defendants at Kettle Moraine. Dkt. No. 1. On November 2, 2022, the court screened the complaint and concluded that it stated a viable Eighth Amendment claim against correctional officer Dakota Monka. Dkt. No. 7. The court dismissed all other defendants and claims. Id. at 9–12.

        On January 3, 2023, the court issued a scheduling order setting a July 10, 2023 deadline for the parties to file motions for summary judgment. Dkt.

No. 11. On March 3, 2023, the court received the plaintiff's motion for summary judgment. Dkt. No. 15. On March 22, 2023, the defendant filed a motion, asking the court to modify the briefing schedule and allow him to file a combined brief in support of summary judgment and response to the plaintiff's motion for summary judgment. Dkt. No. 16. The court granted that motion and ordered the defendant to file his combined brief by the original July 10, 2023 deadline. Dkt. No. 20. At that deadline, the court received the defendant's combined brief. Dkt. No. 31. The plaintiff filed a declaration in opposition to the defendant's motion, dkt. no. 36, and the defendant filed a reply brief, dkt. no. 37.

      B.    <u>The Plaintiff's Motion (Dkt. No. 15)</u>

The plaintiff's motion for summary judgment is a six-page memorandum discussing the facts of his claim, accompanied by thirty pages of exhibits. Dkt. No. 15, 15-1. The plaintiff did not file a declaration or affidavit in support of his motion, nor did he file a statement of proposed material facts.

The plaintiff's motion does not comply with the court's local rule governing motions for summary judgment. Civil Local Rule 56 (E.D. Wis.) requires that a party moving for summary judgment "must file . . . a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Civil L.R. 56(b)(1), (b)(1)(C). Local Rule 56 cautions that "failure to submit such a statement constitutes grounds for denial of the motion." Civil L.R. 56(b)(1)(C)(iii). That the plaintiff is representing himself and litigating without an attorney does not excuse him from complying with the court's local rules. See <u>Hinterberger v. City of Indianapolis</u>, 966 F.3d 523, 528 (7th Cir. 2020)

("[D]istrict courts may require strict compliance with their local rules."); <u>Smith v. Adams</u>, 804 F. App'x 390, 391 (7th Cir. 2020) (same for *pro se* plaintiffs).

Because the plaintiff's motion for summary judgment does not include all the supporting materials that the court's rule requires, the court will deny the motion. The court will consider the plaintiff's memorandum and exhibits in analyzing the defendant's motion for summary judgment.

C.   Factual Background

The plaintiff did not respond to the defendant's proposed facts, as the court's local rule requires. Civil L.R. 56(b)(2)(B). Instead, he included in his response materials a "Statement of Disputed Factual Issues." Dkt. No. 36 at 7. The plaintiff lists only three "genuine issues of material fact that require the denial of defendant [*sic*] motion." <u>Id.</u> Those three issues are:

1. Whether the plaintiff said I'm not a C.O[.] or snitch

2. Whether the plaintiff was not injury [sic] right after being called a C.O[.] and Snitch

3. Whether defendant called plaintiff a C.O[.] out of being sarcastic, or was applied in good-faith effort to maintain or restore discipline or maliciously

<u>Id.</u> The plaintiff does not cite any evidence in support of these purported issues of material fact.

Because the plaintiff did not respond to the defendant's proposed facts as the Local Rules require, the court deems the defendant's facts admitted for purposes of this decision. <u>See</u> Civil L.R. 56(b)(4); <u>Smith v. Lamz</u>, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission."). That means the court will consider the defendant's proposed facts to be true, so long as the defendant supports them by citing evidence in the record. <u>See</u> Fed. R. Civ. P. 56(e)(2).

1.      *The Parties and the Plaintiff's Claim*

The plaintiff was incarcerated at Kettle Moraine at the time of the events alleged in his complaint. Dkt. No. 33 at ¶1. Defendant Monka was a correctional officer at Kettle Moraine. Id. at ¶2.

In its screening order, the court recounted the allegations of the complaint:

> The plaintiff alleges that on October 30, 2021 at around 4:55 p.m., he asked Officer Monka "to open the chemical box and janitor door" so the plaintiff could complete his daily job duties. Monka responded by saying, "ok C.O. Love." The plaintiff responded that he was "not a c.o. or a snitch." Given the context, it appears that the plaintiff understands "c.o." to mean "cooperating offender." Monka responded, "you is today." The plaintiff alleges that other incarcerated persons were around when Monka said this.

Dkt. No. 7 at 4 (internal citations to Dkt. No. 1 omitted). The plaintiff alleged that he suffered various harms from Monka's comments, including "that incarcerated persons have 'harassed and threatened' him," that he and his family "'received numerous threats from prison gang's [*sic*],'" that "he was nearly attacked in the unit bathroom'" and that "he has since 'suffered severe psychological and emotional distress.'" Id. at 7 (quoting Dkt. No. 1 at 9–10).

2.      *Defendant Monka's Response to the Plaintiff's Interrogatories*

In lieu of a declaration or affidavit, Officer Monka filed his responses to the plaintiff's first set of interrogatories. Dkt. No. 34-1. Monka signed his responses and verified their truth and accuracy under penalty of perjury. Id. at 7. Interrogatory #11 asks if Monka "ever called inmate a C.O or a snitch." Id. at ¶11. Monka says that he "called Plaintiff a correctional officer (which [he] abbreviated to CO) as a sarcastic joke due to Plaintiff's and other inmates' demands when [he] was trying to close down the dayroom amongst [his] other duties." Id. Monka says that he has "never called Plaintiff or any other inmate a

snitch." Id. He avers that he "is not familiar with the phrase 'cooperating offender,'" which the plaintiff alleges is what Monka meant when he called the plaintiff "CO." Id. at ¶6.

Monka avers that he did not use "CO" to mean "snitch," and he says that the terms "C.O." and "snitch" are not the same thing. Id. at ¶13. Monka says that calling an incarcerated person "a 'police'" also would not be the same as calling an incarcerated person "a 'snitch.'" Id. at ¶14. Monka reiterates that he never has called any incarcerated person a snitch. Id. at ¶18. He also reiterates that he has called an incarcerated person "a C.O . . . as a joke, to mean Correctional Officer." Id. at ¶19.

### 3. *The Plaintiff's Psychological Service Request*

On November 2, 2021, the plaintiff filed a Psychological Service Request. Dkt. No. 33 at ¶9; Dkt. No. 34-2 at 5. The plaintiff requested that someone from the Psychological Services Unit "call [him] ASAP" because he was experiencing "extrem[e] emotional destress [*sic*] do to some very uncomfortable interactions with an officer." Dkt. No. 34-2 at 5. The plaintiff wrote that he was "having problems sleeping, eating" and was "having anxiety attacks." Id. Staff from the Psychological Services Unit responded on November 4, 2021 and told the plaintiff that he would be seen in the next week, "time permitting." Id.

On November 9, 2021, the plaintiff met with Dr. Maricela Gamboa (not a defendant) in the Psychological Services Unit related to his November 2, 2021 request. Dkt. No. 33 at ¶11; Dkt. No. 34-2 at 2–4. The plaintiff reported that he had "been isolating in his cell after a unit officer called him 'c.o.' seemingly in jest." Dkt. No. 34-2 at 2. He reported that other incarcerated persons nearby heard the comment, and "the implication that he is 'telling' has spread around the institution." Id. The plaintiff told Dr. Gamboa that the situation "is further

complicated by the fact that he is, actually, cooperating, and testifying in an ongoing case." Id. He told her that he is "well connected, criminally, in Milwaukee and was involved in 'a lot of stuff [he] didn't get caught for.'" Id. He also told her that "he knows information about a lot of significant criminal activities in Milwaukee." Id.

The plaintiff expressed concern to Dr. Gamboa for his safety at Kettle Moraine because of Officer Monka's reported comments "and the subsequent reaction within the inmate population." Id. He reported that he had expressed his concerns to superior officers at the prison, but that he "wanted the talk amongst the inmate's [sic] to stop and he wanted to not feel uneasy secondary to this situation." Id. He did not report suffering harm within the institution because of Monka's comments or his perceptions about those comments. Id. Dr. Gamboa advised the plaintiff about who to contact "should he perceive a direct threat to his safety." Id. She suggested that the plaintiff not change his daily routine, "which could raise further questions from other inmates." Id. She noted that his anxiety "was likely exacerbated by his own negative perceptions and expectations" about the situation. Id. She recommended that he "challenge such thought and avoid jumping to conclusions erroneously." Id. Dr. Gamboa found "[n]o evidence of acute mental health concerns warranting a clinical diagnosis." Id. at 3. She recommended follow-up "per request/referral." Id.

4. *Institutional Complaint*

On November 8, 2021, the plaintiff filed an institutional complaint about Officer Monka "calling [him] a C.O and a snitch." Dkt. No. 15-1 at 1. The institutional complaint recounts the allegations in the plaintiff's §1983 complaint and alleges that after Monka called him a C.O., "[i]nmates started

laughing." Id. The plaintiff did not allege that anyone had harmed him since or because of Monka's comment.

The Institutional Complaint Examiner's Office received the plaintiff's complaint a week later, and on November 22, 2021, a complaint examiner recommended dismissing it. Id. at 4. The complaint examiner contacted Monka, who denied calling the plaintiff a snitch and reported "calling him a CO out of sarcasm" because the plaintiff "was being rude and sarcastic to him during this exact incident." Id. Monka told the complaint examiner that he "realized after the fact it could have been handled a different way and reported it to" a sergeant. Id. The complaint examiner also contacted the sergeant, who reported that "he believed Officer Monka's statement to the inmate appeared to be sarcastic." Id. The complaint examiner found "no information that would support any staff misconduct or work rule violations." Id. The complaint examiner described the incident as "a personality conflict or a dislike for the way the staff member asserts his or her authority." Id. On December 15, 2021, the warden accepted the complaint examiner's decision and dismissed the complaint. Id. at 5.

The plaintiff appealed the dismissal of the complaint. Id. at 7. On January 6, 2022, a corrections complaint examiner recommended dismissing the appeal. Id. The corrections complaint examiner concluded that the decision dismissing the complaint "reasonably and appropriately addressed the issue raised," and that the plaintiff had "presented no information to warrant a recommendation overturning that decision." Id. The complaint examiner also noted that Officer Monka's comment "has been addressed by administration." Id.

On January 14, 2022, the plaintiff drafted a Notice of Injury and Claim under Wis. Stat. §893.82. Id. at 8. The plaintiff again recounted the events from October 30, 2021. Id. He related Officer Monka's response to his institutional complaint saying that he had called the plaintiff a C.O. "out of sarcasm," but he alleged that "[o]ther inmates did not see it as him being sarcastic." Id. The plaintiff did not allege that he had suffered physical or emotional harm, but he says that other incarcerated persons were "walking around picking on [him] calling [him] a snitch, when [he] go[es] in the bathroom." Id.

5.    *Deposition Testimony*

On May 10, 2023, the defendant conducted a video deposition of the plaintiff. Dkt. No. 30. The plaintiff testified that there were five other incarcerated persons working in the area on October 30, 2021 when the plaintiff spoke with Officer Monka. Id. at 14–16. He testified that he asked Monka to "open the chemical box and the janitor door for [him]," and Monka responded, "Okay, CO Love." Id. at 18:13–15. The plaintiff responded, "I'm not a CO, or by you calling me a CO, you're calling me a snitch. I'm not a CO or a snitch, so you cannot speak to me in that way." Id. at 18:15–18. He testified that Monka responded, "You is today." Id. at 18:18. The plaintiff testified that "[e]verybody said, 'Oh,' and got to pointing, got to laughing." Id. at 18:19–20. The plaintiff testified that he went into the bathroom, and another person came in and asked him, "Why dude was calling you a snitch? You been going back and forth to court. What you got going on?" Id. at 18:21–25.

The plaintiff testified that after that event, the incarcerated person who had confronted him in the bathroom "walked around telling people [he] was a snitch and that if [he] go[es] to rec or anything, he gonna -- he gonna have his

gang brothers do something to [the plaintiff], and if he catch [the plaintiff] in the bathroom by [him]self, he gonna do something to [the plaintiff]." Id. at 19:13–17. Defense counsel asked the plaintiff if Monka "sound[ed] like he was joking" when he called the plaintiff "CO Love." Id. at 19:22–23. The plaintiff responded, "[Y]ou don't joke like that in a prison setting." Id. at 19:24–25. The plaintiff testified that even if Monka had immediately told him that he was joking, the plaintiff would have taken his comment seriously and as "a big thing." Id. at 20:1–21:2.

Defense counsel noted that she had "called correctional officers COs" and asked the plaintiff, "What did you take CO to mean?" Id. at 21:6–8. The plaintiff responded, "A confidential informant or a confidential -- I don't know. I just don't -- I know that everybody else took it and ran with it." Id. at 21:9–11. The plaintiff testified that before the October 30, 2021 incident, he had not heard Monka call him or anyone else a snitch. Id. at 21:15–22:5. The plaintiff testified that he wrote to the Psychological Services Unit "the next day or the same, the same night" because he "was feeling anxious, feeling like somebody was gonna do something to [him]." Id. at 22:22–23:2.

Defense counsel asked the plaintiff if he felt "any differently safetywise" after the incident. Id. at 23:13–14. The plaintiff said he did and testified that others told him "not to go to rec," that "people shot at [his] grandma's home," that "somebody said they called home and said that [he] was snitching in the joint" and heard that he was "supposed to be snitching around the joint and [he] was snitching on the streets." Id. at 23:17–23. He explained that his cousin told him that "some dudes that was up here had got out and thought [the plaintiff] was snitching," and afterwards his grandmother's house was "shot up." Id. at 30:15–23. But when defense counsel asked him if the shooting was

9

related to the incident with Officer Monka, the plaintiff responded, "How would they know that somebody called me a snitch in jail? They're not in here with us." Id. at 31:5–8. The plaintiff testified that he was still experiencing uneasy feelings "right now today." Id. at 23:25. Defense counsel asked if the people "that are saying this" were "relating it back to Officer Monka" and his comments toward the plaintiff. Id. at 24:1–4. The plaintiff responded, "Yes," and said that members of two gangs were the "people doing this." Id. at 24:5–8.

Defense counsel asked the plaintiff if he had "ever been physically harmed as a result of [his] interactions with Monka on October 30th." Id. at 24:9–10. The plaintiff said that he had "been pushed, and then [he] ran out the bathroom." Id. at 24:11. The plaintiff clarified that this did not happen on October 30, 2021, but that it occurred "like two weeks after or a week after" the incident. Id. at 24:12–19. The plaintiff says another incarcerated person called him a "snitch ass n[****]" and pushed him, and he ran out of the bathroom. Id. at 24:22–25:3. The plaintiff elaborated that this person said, "I heard -- I heard you is snitching. That's why your bitch ass is going to court." Id. at 30:7–8. He testified that he did not experience "any other incidents of anyone physically harming [him] as a result of Officer Monka calling [him] CO Love." Id. at 25:7–10. The plaintiff testified that he does not go to recreation (rec) anymore, but he does use the bathroom by himself "all the time." Id. at 25:14–26:1. He testified that "people" still say things like, "'Man, I think that's the dude they talking about that's supposed to be telling.'" Id. at 26:5–7. The plaintiff denied having filed a request for Health Services for any physical harm suffered because of Officer Monka's comments. Id. at 26:8–12.

The plaintiff testified that he had been going to court because he was testifying against another person related to a homicide case. Id. at 30:11–14.

He said that he stopped going to court because "[e]verybody kept saying [he's] a snitch," and "[he] got scared." Id. at 32:3–6. He explained that before the incident with Officer Monka, no one knew he was testifying in another case. Id. at 32:20–21. But once Monka "said that, everybody like started looking [him] up on CCAP and was like, 'Hold on. He don't have no open cases. Why do he keep going to court for?'" Id. at 32:21–24. The plaintiff says he had to lie to other incarcerated persons he used to talk to at the prison and make up reasons why he had to go to court, "when really [he] was going to court to testify on the homicide." Id. at 32:24–33:3.

The plaintiff testified that Officer Monka never transported him to court to testify as a witness. Id. at 34:15–17. He testified that Monka did "pack[ him] up before," which means he helped the plaintiff prepare for his transport out of the prison. Id. at 34:17–18. But he clarified that when Monka helped him pack up, Monka did not "know where or why" the plaintiff was leaving; he knew only "what county will come get [him]." Id. at 34:18–20. The plaintiff testified that Monka could have known the purpose of the plaintiff's leave from the prison if "he looks on the [paper] and it will say going to court for witness or going to court for material witness or going to court for a case or whatever." Id. at 34:20–23. The plaintiff testified that he did not know if Monka ever looked at the plaintiff's transport sheet to learn the purpose of his visit outside of the prison. Id. at 34:24–35:2. He said that when he helped the plaintiff pack up, Monka never asked the plaintiff why he was going to court. Id. at 35:21–25.

6.    *Plaintiff's Declaration and Other Evidence*

The plaintiff filed a declaration in response to the defendant's summary judgment motion. Dkt. No. 36 at 1–7. The plaintiff avers that on May 21, 2023, almost a year after he filed his complaint, he "was assaulted by a member of

the GD's [Gangster Disciples prison gang] . . . because they found out [he] was the one who was called a C.O. and snitch." Id. at 3, ¶9. The plaintiff says he "sent copies to the courts [*sic*] and defendant's attorney of this incident and the report on 6-6-23" of the assault. Id. at ¶10. He asserts that he "would have never been threatened pushed or assaulted later down the line" but for Monka's comment on October 30, 2021. Id. at 4, ¶14. The plaintiff also avers that Monka knew the plaintiff "was going to Court because defendant packed plaintiff belongs [*sic*] up to go to court before." Id. at ¶12.

The plaintiff does not say when he told this court about the May 21, 2023 assault, and he does not cite any docket entries. A review of the docket shows that on June 9, 2023, the court received the plaintiff's letter informing the court "that the members of the GD's put a hit out on [his] life, due to them hearing around [Kettle Moraine] that [he] was a C.O and [he] was snitching." Dkt. No. 27. The plaintiff says he was assaulted by a gang member when he returned "from court for a sentence modify on 5-18-23." Id. He says the person who assaulted him said he "heard [the plaintiff] was a C.O and [he] was a snitch, so they was going to kill [him]." Id.

The plaintiff attached a copy of a request for information he sent at Kettle Moraine about the incident and a copy of a conduct report about the May 21, 2023 incident. Dkt. No. 27-1 at 1–4. He also attached these documents to his response to the defendant's summary judgment motion. Dkt. No. 36-1 at 3–6. The conduct report notes that the plaintiff was seen fighting with another incarcerated person, and that they were "in a fighting stance and swinging at each other with a closed fist." Dkt. No. 27-1 at 3. The report describes the other incarcerated person, John King, as "the main aggressor." Id. A responding officer successfully stopped the fight by threatening to use his taser on the

plaintiff and King. Id. The plaintiff refused medical treatment for "a small scratch under his right eye" that he sustained in the fight. Id. Prison staff later found the plaintiff guilty of assault, in violation of DOC 303.11. Id.

The plaintiff filed other exhibits with his summary judgment motion. He filed a declaration from another incarcerated person named Matthew Holmes. Dkt. No. 15-1 at 10. Holmes avers that he was present when Officer Monka called the plaintiff a C.O. Id. He says the plaintiff responded, "I[']m not a C.O. or a snitch so don[']t call me that because I[']m not no snitch." Id. He says that Monka responded, "You are today," and walked away. Id. Holmes signed this statement but did not verify its truth under penalty of perjury. Id.

The plaintiff filed exhibits confirming his participation in Milwaukee County Case No. 19CF1405, including documents showing his transport to and presence in court to testify. Dkt. No. 15-1 at 11–22. Several of these papers mention a "Keep separate" order between the plaintiff and Dewan Ashford, the defendant in the Milwaukee County case. Id. at 12, 14, 16–20. The receipts showing his departure from the prison also have a handwritten note that says "Witness" or "Witness?" Id. at 11, 13, 15. The plaintiff does not mention Ashford by name elsewhere in his exhibits or memorandum in support of his summary judgment motion.

## II.    Discussion

### A.    Summary Judgment Standard

A party is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material

fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the non-moving party (here, the plaintiff) must provide more than assertions, allegations or denials; the plaintiff instead "needs to come forward with *evidence*" demonstrating his entitlement to relief that would be sufficient to "support a jury's verdict in [his] favor." Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012); see Cooper v. Haw, 803 F. App'x 942, 946 (7th Cir. 2020) (explaining that "argument alone is insufficient to avoid summary judgment").

B.    Eighth Amendment

As the court explained in the screening order, it analyzes the plaintiff's claim about Monka's comments under the Eighth Amendment. The Eighth Amendment "'imposes on officials the duty to protect those in their charge from harm from other prisoners.'" Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008) (quoting Mayoral v. Sheahan, 245 F.3d 934, 938 (7th Cir. 2001)). The Eighth Amendment also "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain.'" Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)).

To proceed on a claim under the Eighth Amendment, the plaintiff must satisfy objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must present

evidence showing that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. The court explained in the screening order that the plaintiff must show more than that he faced "'a general risk of violence." Dkt. No. 7 at 7–8 (quoting Brown v. Budz, 398 F.3d 904, 909 (7th Cir. 2005)). The plaintiff must "identify a tangible threat to his safety or wellbeing." Grieveson v. Anderson, 538 F.3d 763, 777 (7th Cir. 2008). In other words, he must present evidence showing that "the risk is 'so great' that it is 'almost certain to materialize if nothing is done.'" Wilson v. Ryker, 451 F. App'x 588, 589 (7th Cir. 2011) (quoting Brown, 398 F.3d at 911). To satisfy the subjective component, the plaintiff must present evidence showing that Monka "had a 'sufficiently culpable state of mind.'" Id. (quoting Farmer, 511 U.S. at 834). Monka had a sufficiently culpable state of mind if he subjectively knew of and disregarded "'an excessive risk to [the plaintiff's] health or safety.'" See Dale, 548 F.3d at 569 (quoting Farmer, 511 U.S. at 837). In other words, the evidence must show both that Monka was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that Monka "also dr[e]w the inference." Farmer, 511 U.S. at 837.

The plaintiff claims that Monka labeled him a "cooperating offender" or a "snitch" by calling him "CO" or "CO Love." The Seventh Circuit has observed that it is "common knowledge that snitches face unique risks in prison." Dale, 548 F.3d at 570. Courts outside of the Seventh Circuit also "have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners." Burns v. Martuscello, 890 F.3d 77, 91 (2d Cir. 2018) (citing cases). But the Seventh Circuit has cautioned, "Just because a correctional officer knows an inmate has been branded a snitch . . . does not

mean that an officer violates the Constitution if the inmate gets attacked." <u>Dale</u>, 548 F.3d at 570. The appellate court has advised that evidence showing that an officer knows an incarcerated person is labeled a snitch "may *support,* not prove, a claim for deliberate indifference." <u>Id.</u> (citing <u>Grieveson</u>, 538 F.3d at 775–76). The court must examine the facts of this case to determine whether Officer Monka's comment calling the plaintiff a CO placed the plaintiff at an excessive risk of harm to his health or safety and whether Monka knew of yet disregarded that risk when he made his comment. <u>Id.</u>

      C.    <u>Analysis</u>

It is undisputed that on October 30, 2021, the plaintiff asked Officer Monka to open a chemical box and janitor door while the plaintiff was performing his job-related duties at Kettle Moraine. It is undisputed that Monka responded by calling him "CO" or "CO Love." The plaintiff's version of his response changed somewhat between his complaint, his deposition testimony and his summary judgment materials. But each version includes the plaintiff responding to Monka by insisting that he was "not a c.o. or a snitch." The evidence shows that Monka replied, "You is [or 'You are'] today."

      1.    *Objective Component*

The first question is whether Monka calling the plaintiff "CO" or saying "You is/are today" in response to the plaintiff insisting that he was not a CO or snitch placed the plaintiff at excessive risk of serious harm that was "almost certain to materialize."

The court noted above that snitches face a unique risk in prisons. The court also explained in the screening order that if Monka called the plaintiff a snitch, his "comments could have led other incarcerated persons to believe that the plaintiff was a cooperator or a snitch." Dkt. No. 7 at 8. The court went on to

16

Case 2:22-cv-00780-PP   Filed 10/31/23   Page 16 of 25   Document 38

explain that, "[i]f that happened, the plaintiff understandably might fear retaliation by other incarcerated persons in the form of threats or attacks." Id. But it is undisputed that Officer Monka did *not* call the plaintiff a "snitch." The evidence shows that it was the *plaintiff* who first used that word when he responded to Monka by insisting that he was "not a c.o. or a snitch." Even fellow Kettle Moraine incarcerated person Matthew Holmes says that Monka called the plaintiff a CO. He says the *plaintiff* responded by insisting that he was "not a C.O. or a snitch so don[']t call me that because I[']m not no snitch." Dkt. No. 15-1 at 10. This is not a case where Monka, knowing the plaintiff previously had been labeled a snitch, failed to protect the plaintiff from other incarcerated persons who knew about the plaintiff's reputation. The plaintiff testified that no one had called him a snitch before October 30, 2021, and there is no evidence that he had that reputation or had felt threatened by other incarcerated persons before then. The question is whether Monka calling the plaintiff "CO" had the effect of labeling him a snitch within the prison and creating a risk of certain and serious harm.

The plaintiff asserts that Monka's comments placed him at risk of harm because he and the other incarcerated persons around him interpreted Monka's comments as labeling the plaintiff a snitch (even though Monka did not use that word). The complaint does not allege any specific incident when another incarcerated person threatened the plaintiff or harassed him after Monka called him "CO." It alleges generally that the plaintiff "has been harassed and threatened by other inmate's." Dkt. No. 1 at 9. The plaintiff testified at his deposition that since Monka's comments, "everybody" at the prison "ran with it," suggesting he now is known in the institution as a snitch. The plaintiff asserts that this label continues to follow him through the prison.

But he also testified that in the two years since Monka's comments, the plaintiff has been called a snitch only twice. He testified (but did not allege in his complaint) that one person confronted him in the bathroom immediately after Monka called him CO, and another pushed him in a bathroom a week or two later. He says he was told not to go on recreation because he would be harmed if he did. The plaintiff says he has not attended recreation since October 30, 2021, but he continues to use the bathroom on his own. It is undisputed that he has not been attacked during recreation or in a bathroom (aside from the push) since Monka's comments.

The plaintiff also provided no evidence that any other incarcerated person interpreted Monka's comments as labeling him a snitch. He did not provide statements from any incarcerated person corroborating the plaintiff's belief that "CO" means "cooperating offender." Nor did he present evidence suggesting that "CO" has ever meant "cooperating offender" in any prison, or that persons incarcerated at Kettle Moraine widely use "CO" as shorthand for "cooperating offender" rather than "correctional officer." The only statement the plaintiff filed from another incarcerated person is the statement from Holmes, who recounts the events from October 30, 2021. Holmes does not say what he interpreted "CO" to mean or that it led him to believe the plaintiff was a snitch. Nor did Holmes corroborate the plaintiff's statement that "everybody" at the prison believes that the plaintiff is a snitch because of Monka's comments.

The evidence suggests that rather than creating an *objectively* serious risk of harm to the plaintiff, Monka's comments created in the plaintiff a *subjective* fear that he had been outed as a cooperator (or snitch) and that he was at risk of harm. The plaintiff expressed his concern about Monka's comments to various supervisory officers in the prison and in an institutional

complaint. But staff who reviewed his institutional complaint dismissed it and the plaintiff's later appeal as having no merit. The notes from his visit with Dr. Gamboa in the Psychological Services Unit also reflect that the plaintiff's concern about his situation was one-sided. The plaintiff was able to identify Monka's statement as made "seemingly in jest," yet he still expressed "some concern over his safety" from other incarcerated persons. Dkt. No. 34-2 at 2. He did not identify specific instances of threats or risks of harm and did not specify incarcerated persons or prison groups who had threatened him. He told Dr. Gamboa that he feared the reaction within the prison population generally, "that he wanted the talk amongst the inmate[]s to stop and he wanted to not feel uneasy" about the situation. Id. Dr. Gamboa suggested that the plaintiff avoid erroneously jumping to worst-case scenarios and worsening his own anxiety, and she advised the plaintiff to contact staff "*should he perceive* a direct threat to his safety." Id. (emphasis added). These comments and notes, made less than two weeks after Monka's comments, suggest that the plaintiff was experiencing only subjective, general anxiety about the situation.

The plaintiff's complaint and motion for summary judgment suggest that at most, he faced "a risk of physical harm" but suffered no actual harm. In the Seventh Circuit, the risk of harm alone does not state a "compensable claim under the Eighth Amendment." Saunders v. Tourville, 97 F. App'x 648, 649 (7th Cir. 2004) (citing Babcock v. White, 102 F.3d 267, 272 (7th Cir. 1996)). If that were the only the evidence in support of the plaintiff's claim, the court likely would dismiss it as failing to satisfy the objective component of an Eighth Amendment claim. But in a June 9, 2023 supplemental filing, and in his response to the defendant's summary judgment motion, the plaintiff avers that in May 2023 he was attacked by a gang member who told the plaintiff that the

gang heard he was a CO and a snitch. The plaintiff claims this attack occurred because Monka called him "CO" nearly two years earlier.

It is difficult to believe that a gang member would attack the plaintiff because the gang had heard that a correctional officer had called the plaintiff "CO" on one occasion nineteen months earlier. See Jones v. Butler, 663 F. App'x 468, 470 (7th Cir. 2016) (incarcerated person's alleged fear of harm from guards "because of a years-old grudge" did not support a finding "that he faced a credible, excessive risk of serious harm"). The defendant suggests the gang member attacked the plaintiff, not because of Monka's comment, but because only days earlier, the plaintiff was in court for a sentence reduction based in part on the testimony he provided in the homicide case. It is undisputed that it was not public knowledge that the plaintiff was testifying in the homicide case. But the fact of plaintiff's sentence reduction hearing is publicly available through the Wisconsin Circuit Court Access Program, though the electronic docket does not specify the reasons the plaintiff received a sentence reduction. It is more likely that it became known in the prison that the plaintiff went to court for a sentence reduction, and that is why a gang member confronted him about his "snitching."

But at summary judgment the court may not weigh the credibility of the plaintiff's statements in his declaration. Nor may the court weigh conflicting evidence and decide which scenario a jury is most likely to believe. It "is the job of the jury, and not the district court judge at summary judgment, to determine which party's evidence to credit." Payne v. Pauley, 337 F.3d 767, 778 (7th Cir. 2003). The defendant has provided evidence suggesting that the plaintiff did not face an objective risk to his safety from Monka calling him "CO." But the plaintiff presented evidence in his declaration suggesting that other

incarcerated persons believed he was cooperating or snitching because of Monka's comments. A reasonable jury could accept the plaintiff's version of events and conclude that the plaintiff faced an objectively serious risk of harm from Monka's October 2021 comments, even though it took almost two years for that risk to materialize and result in him being attacked.

>2.    *Subjective Component*

Even if the evidence would allow a reasonable jury to find that Officer Monka's comments posed an objectively serious risk to the plaintiff, the evidence would not allow a reasonable jury to find that Monka subjectively perceived that risk and disregarded it when he called the plaintiff "CO." It would be one thing if Monka 1) knew that the plaintiff was cooperating in the homicide case and then 2) called him by a term that an incarcerated person might recognize as shorthand for snitching or testifying against another person. But the evidence does not support a finding that either of those things occurred.

First, there is no evidence that Officer Monka knew when he called the plaintiff "CO" that the plaintiff was cooperating, or testifying, in a state court homicide case. The plaintiff testified at his deposition that it was *possible* Monka could have learned that the plaintiff was going to court when he helped the plaintiff pack up to leave for court. But the plaintiff's speculation that Monka could have learned the purpose of the plaintiff's court visit is just that—speculation. There is no evidence to support it. The plaintiff testified that he did not recall Monka ever asking him why he was going to court or confirming that the plaintiff was testifying as a witness in a homicide case. There is no evidence that even if Monka knew the plaintiff was going to court, he knew *why* the plaintiff was going to court. There is no evidence that Monka knew that the

plaintiff was testifying as a witness in another case. The plaintiff's speculation that Monka *may have* known that he was going to court and *might have learned* that he was testifying, without evidence supporting those speculations, is not enough to create a genuine dispute of fact on this issue. See Ammerman v. Singleton, 817 F. App'x 265, 268 (7th Cir. 2020) (citing Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)) ("[S]peculation is insufficient to survive summary judgment.").

Second, there is no evidence that when Monka called the plaintiff "CO" he intended that term to refer to the plaintiff as a "cooperating offender" or as shorthand for "snitch." Nor is there evidence that Monka knew the term "CO" is used an acronym for "cooperating offender" or as shorthand for "snitch." It is undisputed that Monka meant "CO" as an acronym for "correctional officer." It is undisputed that "CO" is a widely accepted and generally known abbreviation for "correctional officer." It is undisputed that Monka never has heard "CO" used as shorthand for "cooperating offender" or "snitch." It is undisputed that Monka never has called the plaintiff a snitch or a cooperating offender. The *plaintiff* may have perceived "CO" to be a shorthand for "cooperating offender," but he presented no evidence suggesting that any *other* incarcerated person interpreted "CO" the same way. Nor did he present evidence suggesting that "CO" regularly is used as shorthand for "cooperating offender" in Kettle Moraine or any correctional institution. The plaintiff cannot ascribe meaning to Monka's use of the term "CO" without evidence showing that is what Monka meant when he said it or that others understood it as the plaintiff says he did. See Grieveson, 538 F.3d at 775 (quoting Mayoral v. Sheahan, 245 F.3d 934, 938 (7th Cir. 2001)) (incarcerated person's unshared belief that "he was considered a snitch

does not allow a factfinder to conclude 'that a prison official knew of a substantial risk from the very fact that the risk was obvious'").

There is evidence that Monka spoke with a supervisor after the October 30, 2021 incident because he felt that he could have handled the situation differently. This might suggest that he felt some guilt for making his comments to the plaintiff, comments that arguably were not professional or appropriate regardless of the connotation. But as the court noted in the screening order, "prison officials' unprofessional comments to incarcerated persons do not violate the Eight Amendment," except in exceptional circumstances. Dkt. No. 7 at 8 (citing Beal v. Foster, 803 F.3d 356, 357–58 (7th Cir. 2015)). An unprofessional comment does not, by itself, equate to a life-endangering comment. There is no evidence that Monka spoke with a supervisor about the incident because *he* believed his comment placed the plaintiff at a substantial risk of serious harm. The plaintiff's complaints to supervisors after the incident similarly suggest only that Monka or others might have been informed later that *the plaintiff* became anxious about Monka's comments. At best, Monka's comments may have constituted negligence on his part to the risk that a potential misunderstanding of his comment could cause to the plaintiff (although if he was not aware that "CO" could be interpreted to mean "snitch," even negligence is a stretch). But negligence does not violate the Constitution. See Farmer, 511 U.S. at 835–36; Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001).

Because there is no evidence that Monka knew the plaintiff was cooperating or providing testimony or that "CO" reasonably might have been interpreted to mean "cooperating offender" or as a shorthand for snitch, the plaintiff has failed to satisfy the subjective element of his Eighth Amendment

claim. The undisputed evidence would not allow a reasonable jury to find that Monka subjectively knew that the plaintiff would face an excessive risk of harm when Monka called the plaintiff "CO" and disregarded that risk by making his comment. Monka is entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claim.[1]

The court will restrict access to documents that mention the plaintiff's cooperation in the state court case to the parties and the court. Those documents are at Dkt. Nos. 32, 33, 34-2, 36 and 37.

As a final note, the plaintiff asserts that Monka's comments violated prison policy or procedures, which he asserts satisfies the components of an Eighth Amendment violation. But the court advised the plaintiff in the screening order that "§1983 protects against only constitutional violations; it provides no protection for violations of departmental regulations and practices." Dkt. No. 7 at 11 (citing Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017); and Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003)) (cleaned up). Whether Monka's actions violated institution or department policies has no bearing on whether the plaintiff presented sufficient evidence showing those actions violated his Eighth Amendment rights.

## III.    Conclusion

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 15.

---

[1] Because the court is granting summary judgment to Monka on the merits, it will not analyze his claim that he is entitled to qualified immunity. See Sierra-Lopez v. County, No. 17-cv-1222-pp, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 31.

The court **ORDERS** that this case is dismissed. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of October, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**